Good morning. May it please the Court, Counsel, I am Art Boylan and I represent the Appellant Strategic Energy Concepts. We're here to talk about a summary judgment ruling that ought to be reversed and remanded for trial. The reason for that is clear. This case has been pending for a long time and sometimes as cases go on, rather than getting more clear, things get more muddled. Here in preparation, it's clear to me we've muddled this a little. It's what? It's muddled a little. Here's the reason why I say that. There's a very clear provision. When proceeds are available and not otherwise required to be reserved by specific transaction documents, my client was entitled to a payment. There's no doubt, everyone agrees, $25 million was paid. There's no real question when you get into the facts of this case that there was about $1.9 million that came through the transaction and was deposited into an operating account and a completion account. Those proceeds were there and they were available to pay my client. That satisfied the condition. My understanding, though, is that the written materials said it would come out of the first $5 million installment payment. Do we have to ignore those documents to get where you want to go? No. Actually, you're kind of right, Your Honor, and kind of wrong. Okay. In the same paragraph, it goes on and it explains the expectation. I'm trying to look at it. Here it is. The parties anticipate that that payment will be no later than the second installment date. Just as a refresher, there was $25 million coming in. That happened. There were two additional tranches, another $5 million and another $5 million, for a total of $35 million. The expectation was, okay, we're going to probably spend all the $25 million on things that we know are out there and need to be paid for. Then there's going to be another $5 million. You might get paid there. But our expectation is that you will definitely be paid by the second installment. And you're reading from the flow of funds memorandum? I'm reading from paragraph, no, not the flow of funds, the MIPA, and in particular, paragraph 1.2. I was asking about the other documents. Sure. My understanding is the flow of funds memorandum had identified the first installment payment as when your client would get paid. You're telling me that that's wrong, but I just want to be sure. Okay. Yeah. So now we're talking about the right thing. Yes. Your Honor, yes. There was a flow of funds memorandum, and actually it's also referred to as a project budget that says, in pretty basic terms, here's where we think the first $25 million is going to go. And my client was identified as a payee in the first $5 million that was going to come in after that first $25 million. But all of that, that isn't necessarily, you know, whether or not a condition is satisfied. Right? This is when we're going to get around to paying you. What the condition here was, and this is section 1.2 of the MIPA, of the Membership Interest Purchase Agreement, when there are proceeds available that aren't required to be reserved to somebody else, aren't required by the transaction document, it says it very clearly. Then your right to payment will go from theoretical or contingent to fixed. But doesn't the flow of funds memorandum, and there was also, I think, a settlement to the escrow agent, don't they reflect that those monies for the first $25 million were going to other places, not to your client? Kind of. Right? Yeah. So let's talk about that. So the first draft of this document, the settlement statement, which I appreciate Your Honor bringing up, the line and page for it, so to speak, it's at the appendix at 554, and the particular pages I love are at 556 and 557. This is the first draft. It only accounts for $21.5 million. This is June 28th. I'm about to get to your point, Your Honor. There's $3.5 million that they don't know what, where it's going. There's a long list of people getting paid. There's going to be $3.5 million left. This is great for my client. There's going to be proceeds available. Then on June 29th, the next day, and it's actually at midnight. You can't get better. I mean, that's 11th hour stuff, I think. This is at appendix 559, and the specific page is 562. Now they've changed it, and it shows $1.9 million going to what are called reserve accounts. The problem for them, Your Honor, and the question that I'd be asking is, well, were these payments or were these going to other parties? Because if money was going to them, those are proceeds available to them, and they needed to pay my client. So when it's going to a working capital account, when it's going to near-term capital payments with no specificity, and ultimately when you get to the June 29th final statement, which is the third document I like, it's at appendix 574, and the specific page I really like is 557. It's got $1.9 million. Why did you say 574 and then 557? I'm sorry. I just misspoke, Your Honor. I apologize. The first page of it is 574. That's where I would go if I were pin-citing this. That's the first page of the document. Tell me what page you want to look at. I want you to look at 557. 577, excuse me, Your Honor. 577. When you get to the bottom of that one, and you get to the last couple lines, you see, and it wasn't there 24 hours before, $1.9 million going to the BVBP operating account and the BVBP completion account. Those are proceeds, and I spent a lot of time at a deposition asking where were those monies supposed to go? I don't understand, right? These are monies that you then had available to you to spend in whichever way you see fit. This is $1.9 million in your accounts ready for use. That's the other thing here. It's the Mustin deposition. Mr. Mustin is a representative of ATOCA. He was the corporate designee. I spent a long time talking with him about how do I fit all these pieces together. And in particular, I would point you to the appendix 234 to 239. That's a lot of deposition testimony because it's mini script. But you'll see me going around with him saying, okay, I understand what's happening. This $1.9 million now lands in the operating account. Was that required to be reserved? Show me where in the other transaction documents that we've just looked at, Mr. Mustin, where is it reserved? Why are you required to set aside that $1.9 million? He couldn't do it. And that drives me all the way back to where I'd begin. Usually on a summary judgment motion where the defendant wins on a contractual basis, it's because you can point to a particular provision and say, you lose because here's specifically where something was required. Here, that's the question you've got to ask them. Where in these transaction documents, they're enormous. Back there, they're enormous documents. Where is this specific provision requiring a set aside of $1.9 million? It's $1.9 million to you because if those proceeds were available to them, my client had a right to payment. Where are there documents requiring all the other monies to be set aside? Well, yes, Your Honor. Where do we look for the other $22 million? If you walk carefully through it, the flow of funds memorandum says very specifically let me get to my notes here. The PSA defines the flow of funds memorandum that will identify the amounts paid in satisfaction of the marquee bank loan. There was a huge loan on this property. That's number one, and it's expressly laid out. Two, all transaction expenses to be paid. What are you reading from now? I'm reading from Appendix 476, which is the PSA. It lays out transaction expenses. So one, the bank loan's got to get taken care of. Two, transaction expenses to be paid on the closing date. That's the lawyers, accountants, and whatnot. Three, the amount paid to contractors on behalf of the company to satisfy the payment in full of all remaining amounts, then due and payable. That's what was supposed to happen. So people, when you get to the end of this transaction, there's $25 million coming in. They say we better make sure that we have all of the payments lined up. Whoever needs to be paid, get us an invoice because we're going to get you paid. The reality is that when they got to that point in late June, and you see it through the evolution of the first draft where there's $3.5 million left, and then the second draft where they're saying let's throw the rest in our operating agreement, they did a little better than they expected as of June 25th. They had obligations they knew were coming up soon, and so they held those proceeds aside. They put them into their operating account. Let me ask you this. My understanding of the record is on the $1.9 million, I think maybe there's some deposition testimony that I don't know that you're disputing, but tell me if you are, that that was needed for short-term operating expenses, that it was earmarked for that and therefore wouldn't have been available to make the payment to Strategic. Great. Fine. But the payments, the money, the proceeds were available to them to sit on. And they're saying, well, hey, Strategic Energy, you've got to be patient for us. We have proceeds available, so you're right, went from contingent to fixed, but you've got to be patient with us. We're going to pay you when subsequent monies come in later. That doesn't change the legal analysis at all. They had proceeds available. My guy is sitting there saying, great, but I can be a decent partner to you, and I can wait to be paid when the next $5 million and the next $5 million come in. But that has nothing to do with whether or not that went from contingent to fixed when they had proceeds available that were not otherwise required to be reserved pursuant to the transaction documents. If you don't have that, and you just have the $1.9 sitting there, how does my guy not get paid? It's, and this is why, this is why I get back to, on summary judgment, where someone says, and they do it over and over and over again, look, it was required to be paid. It was required to be reserved. Where? Tell me where outside of your decision at the 11th hour to slide it into your operating account, which I don't know how much more it could be available as proceeds than sitting in your operating account, because if a big bill came due the next day, they had every right to pay it. Now, my guy isn't getting paid because there's some language in there that says, maybe we expect that you'll be paid in the next installment. So if you parse it carefully, that's exactly where you end up here on this. This is a case that ought to be tried. Because while I can argue to you, and you can see it through my argument, I can argue to you, here's what the terms of the contractual language mean. Here's the way this all fits together. There might be some ambiguity there. There might be some room for disagreement. But that's why you have trials. That's why there wasn't an absence of genuine issue of material fact. This was replete with genuine issues of material fact. Were they authorized? Were they not? What were these reserves for? Why did they feel like they had the right to take them? I deserve to say in front of a jury, all right, Mr. Mustin, where in these agreements, just like I did in the deposition, where in these agreements does it say you have the right to do that? Because you didn't, so far as I can tell. In addition, let's say all of that doesn't matter. Because like I said at the top, things get less complicated as you think of, you know, try to back up the camera a little bit. Even if they're right about exactly what their right was, they had the authority at the 11th hour to pull that 1.9 aside and put it in their operating agreement, that still leaves the question of, weren't those proceeds available to you? Who were you going to pay? Who were you required to pay outside of my client? Now, briefly, there's a series of other issues. The tortious interference with contract, there's no doubt State Street knew all about this contract. There's evidence in the record, tons of it. They controlled payments at the 11th hour and after the 11th hour. Both of those issues are the knowledge and the decision to exercise some authority that is the sort of tortious interference that's recognized under Minnesota law. Now they say, and the district court said, maybe it was justified because they had a contractual right to do that. Burdens on them to do that, again, tell me the specific provision. I don't think they got it. That's all that I'm going to say for now because I've reserved a few minutes. I appreciate your time and your patience this morning with all of the arguments, but including mine. Thank you for your argument. Thank you, Your Honor. I'm going to be arguing on the breach of contract claim, which is directed at Atoka and BVBD. State Street's counsel will be arguing the other substantive issues, and if there are any questions about the discovery order and the issues raised as to that, I can answer those as well. The central question that Mr. Boylan pointed to on Strategic Energy's contract claim is whether the district court correctly determined that an unfulfilled condition precedent rendered the MIPA payment to his client unenforceable. The answer is yes, and the court should affirm. As an initial matter, Strategic Energy does not dispute that Section 1.2 of the MIPA established conditions precedent to that payment. There's also no dispute that the 2012 tax equity transaction, State Street made an initial $25 million payment and did not pay the two later $5 million installments that were contingent on project milestones. Instead, Strategic Energy is focusing only on, one, whether funds were, quote, available from the initial $25 million payment, and two, whether all of the $25 million was required to be reserved or paid to parties other than Atoka. Or BVBD. The contract, the MIPA, was between Strategic Energy and Atoka and BVBD, not BVBP. And that's an important point to mention. So Mr. Boylan wanted me to point out the transaction documents and where the funds were required to be paid. Ultimately, the funds for the MIPA payment to Strategic Energy were not available from the $25 million. Because they were required to be paid or reserved to others by all of the transaction documents in their totality. So let's walk through what those are. So there's the ECCA, which is the Equity Capital Contribution Agreement. And that defines transaction documents as including, among others, the ECCA itself. The PSA, the Purchase and Sale Agreement, which is the only document that Mr. Boylan referenced. And what's called an instruction letter, among other documents that are set out in that definition. And that definition is at Appendix Page 423. Section 2.2 of the ECCA, which is two pages later at Appendix 425, expressly provided that the title company, which was the escrow agent, shall wire the proceeds from the initial $25 million payment in accordance with the instruction letter. The instruction letter, which is at Appendix 652, instructed the title company, the escrow agent, to disperse the $25 million in accordance with the final settlement statement. That's at Appendix 732. The final settlement statement was prepared from the final flow of funds memorandum agreed to by the parties. And that is at Appendix 559 and Appendix 574. In addition, the ECCA itself incorporated, both in its definitions and as Annex 12a, a project budget. And that project budget was likewise consistent with all of the funds, where they were going, to whom they were being paid, and what the title company, the escrow agent, was instructed to do upon the closing with all of those funds. Funds came in from Antrim, which was the operating company established by State Street. Funds came in to the escrow agent. Escrow agent understands that all the funding, the conditions are satisfied for the distribution of those $25 million. The escrow agent follows the instruction letter, disperses all of those funds in accordance with the final settlement statement, which is the final flow of funds, which is the project budget. And we'll talk about that quite a bit. So the $1.9 million, Your Honor, there's a couple of different threads there. So I believe the $1.9 million that Mr. Boylan is actually talking about is what he's referring to as proceeds available, which were funds that were paid, that were reserved to BBBP. BBBP was the project company. That's the asset. That's the power plant. Okay? BBBP was not a party to the MIPA. BBBP had no obligations to pay the MIPA payment. The only entities that had an obligation to make the MIPA payment were Atoka and BBBD. Now, it was determined as the parties were progressing, including Mr. Boylan's client, the parties were leading on the way to closing. And as I think it was you, Judge Strauss, referenced, there were issues that were coming up. I'm not going to get into all the details of, but what ultimately was occurring was that the parties were all realizing there were going to be expenses that needed to be put into this project in order to carry it over and across the finish line to complete the project in order to convert this coal-fired power plant into a biomass-fired power plant. And so there were discussions. There were discussions among State Street and Atoka and Strategic Energy about how are we going to account for this. And so in order to close the deal, funds were required to be reserved to BBBP, which is not — which is a party other than, quote, the company or Atoka, which is the definition in the definition. And so those funds were reserved to BBBP to pay for those anticipated operating construction repair costs. And Strategic Energy knew about this. This wasn't an 11th-hour decision. We pointed to several documents in our separate appendix, and I would point you specifically to separate appendix page 39. This is an email from Mr. Mustin dated June 24th, five days prior to the closing. And in this email to Mr. Thompson, who is Strategic Energy's principal, Mr. Boylan's client, Mr. Mustin relays his notes and recollections from his discussion that night with Mr. Thompson. And he says specifically here, given other required costs at closing, it is expected that the funds be paid, i.e., the first $5 million after the $25 million. And so Mr. Thompson knew about it before the closing. He knew about it at the closing, because all of the documents that I just described earlier were shared with Mr. Thompson. He knew he had the final flow of funds memorandum. He saw where Strategic Energy was going to get paid out of the first $5 million installment. He was intimately involved in this transaction at every stage. And then even after the transaction, in separate appendix pages 52 to 53, there are email communications months later in which Mr. Thompson is relaying information to his other investors and other colleagues of his that — in which he acknowledged that the MIPA payment to Strategic Energy was to be made from the later installment payments and not from the initial $25 million. So what were the obligations in addition to the $19 million bank loan payoff? Your Honor, those are — those are — Where do we find those? Yeah. So, well, I mean, the list of them — I mean, a handy list of them is if you look at — I mean, I think probably the best place to look would be the instruction letter. I think that's probably the most authoritative, because the instruction letter is what the escrow agent, the title company, was in the end directed to distribute the funds. And so the instruction letter is — Which page are we getting in? Yeah. Appendix 650, 650. And then that document has attached to it numerous exhibits. And so if you look on Appendix Page 652, it says, When all the foregoing conditions have been met, the escrow agent is hereby authorized and instructed to agree to, number two, disperse the funds deposited by Antrim Corporation and held in escrow by the escrow agent in accordance with Exhibit F. If you turn to Exhibit F, Your Honor, that's at Appendix 731. And that includes the list, the final accounting of where all the funds are going. And do you say that if we follow all of that trail that you've just laid out, the $25 million is used up? Correct, Your Honor. I think there may have been a $43,000 overage, and there has been no indication from Strategic Energy that that's somehow been unlawfully withheld from them. What do you mean there's no indication that that's unlawfully? There's been no argument that's been raised by Strategic Energy that somehow this $43,000 was somehow not available to pay. Well, if it wasn't allocated, why wasn't it available? I think there was discussion among the parties about how to account for the $43,000 after the fact. I'm just simply saying that that hasn't been raised as an issue in the case. Well, it's in the brief, isn't it? I don't believe it is, no, Your Honor. So the way you two want to do it is you want to have Second Counsel argue issues that weren't argued by the appellant rather than spend more time on the contract questions? I'm not sure how Mr. Carnathan wants to handle his arguments that are directed at State Street. I believe Mr. Boylan did raise tortious interference. My time is up. I was going to discuss the discovery issues. Mr. Boylan did discuss those, so we'll just rest on the briefing as those. Well, I guess it may have been a mistake to allow divided argument. I guess it's up to you at this point. If you want to argue issues that weren't raised and let Mr. Boylan respond in rebuttal, then I guess we've allowed that, so go ahead. You should read Robert Jackson's article about why divided argument is almost always problematic. Go ahead. Thank you, Your Honor. May it please the Court, my name is Sean Carnathan. I'm here on behalf of the State Street Bank and Trust Company and Antrim Corporation appellees, and we'll refer to them simply as State Street here today. Certainly, I would prefer to use my time focused on any questions that the Court may have. If Your Honor had further questions about where Mr. Pieper was going, I think I'm at least as familiar with the record, and I'm happy to go there. Well, I have a question, and maybe you're not the person to answer it. But is there, is it true, I don't know how to say it, is there any dispute between the parties that after the $25 million was paid and dispersed to different places, either correctly or incorrectly, that there was an additional $10 million loan that went into this transaction by Atoka? That's undisputed, Your Honor. Atoka did loan BVBP and Amador, the operating companies, $10 million in November of 2012, and that was on top of another $1.4 million that Atoka had to put in in September and October of 2012. And that's really the rub here. And was that $10 million, was that necessary because the $25 million was not sufficient to pay all of the obligations that were out there? It proved wildly insufficient, Your Honor. I mean, the real difficulty in this case is the project was a fiasco. And it's undisputed, Your Honor, that the reserves were set aside because at the basically the last moment, in the couple of days prior to the anticipated closing of the tax equity transaction, the payables surged and it turned out that the plant was going to be unable to go commercially operational on July 1 as planned. The deal was supposed to be that State Street put in the $25 million on June 29th. The plant turned on on July 1, started selling power, and we all made money and sailed off into the sunset. Instead, a couple of days before the transaction closed, it turned out that it could not become commercially operational on July 1. And that's why there had to be reserves set aside, because otherwise there wasn't going to be any money to keep the plant afloat and to do the work necessary to become commercially operational. And Atoka had to engage in last-minute heroics to go to the Sacramento Municipal Utility District that we've been calling SMUD and get an extension of the time in which to declare commercial operation and save the power purchase agreement with SMUD. The whole idea was we're going to sell power to SMUD, and SMUD could have terminated this agreement. And so just before State Street closes, State Street learns we're not going to be able to turn on the plant. The payables have gone way up, and that's why reserves are set aside. Well, things got worse from there. I mean, the plant really never operated the way it was supposed to. It took many months to actually achieve this so-called commercial operation. They didn't manage it until October. And there's sort of some ongoing conflation of terms and whatnot in this case, Your Honor. But there's commercial operation in the ordinary sense, like we're going to operate the plant, and then there's commercial operation with the meaning of the power purchase agreement, which simply meant that they could run the darn plant for 48 consecutive hours. It took them months to manage to keep the plant on for 48 hours. And then as soon as they did that, they had to shut it down for a month's worth of repairs and spend millions of dollars to try to repair the plant, which is when Patoka's now putting in another $10 million. They didn't actually get to run the thing until December of 2012. They ran it for a few months, never achieving contract capacity. And then the boiler blew up in May 2013. And so when we talk about these reserves, they were absolutely necessary, and they were necessary from State Street's standpoint to close the transaction. I mean, one of the major fallacies here is that some draft instruction letter from a few days before the closing should somehow have bound State Street to close this transaction without these reserves. Well, who decided that these $1.9 million would be in the reserves? I believe it's undisputed that State Street insisted that those be reserved. Where would we find that in the record? I can't quote you the page number. I believe Santosh Raikar testified to as much. He was the lead president of Antrim, and he was responsible for making the investment. But it was undisputed that that's what these things were for, and it was because the plant could not go operational on July 1 as anticipated. And I think Mr. Pieper made the point, but I'd like to reemphasize it. This money was in the BVBP operating account. And the acronyms are enough to make you crazy in this case, but BVBP. Why use them, then? Why not use Clarity? Well, it seemed like a good idea at the time, Your Honor. Now there's a long trail of them in all the documents. But BVBP is the power plant. That's Buena Vista Biomass. We call it power plant. That might help the reader. Go ahead. In retrospect, Your Honor, that would have been good. But BVBD, Buena Vista Biomass Development, was the company that had a contract with Strategic Energy as a party to the so-called MIPA, the Membership Interest Purchase Agreement. So when Mr. Boylan insists this money is just sitting there, it's not. It's sitting in another entity's operating account, and it's reserved specifically for operating expenses that are listed on the instruction letter, which, as Mr. Pieper explained, is a transaction document. And the MIPA itself says that funds are not available if they're required to be reserved by a transaction document. Well, let me ask you this. So some of the stuff that you're saying actually goes to tortious interference as well. If State Street insists that the $1.9 million be reserved, isn't there an argument that that satisfies sort of the tortious interference, which is that the net effect of that was the strategic doesn't get paid? No. Respectfully, I don't think there is, Your Honor. I mean, State Street, at the moment, it's insisting or requiring that these monies be reserved. It's just a potential investor. I mean, this is a requirement of it to put $25 million into the transaction. And it's saying, if you want us to put the $25 million in, we need to see that this plant is going to operate, that it's going to succeed. And truthfully, at that point, Strategic Energy wanted the same thing. I mean, one of the things that it keeps saying here is that all it got out of this deal was $1.1 million payment right. But that's not so. It also had a multimillion-dollar interest in the plant succeeding because under the MIPA, it retained an equity-esque contractual right that if the Class A membership interest was later sold, it was going to participate and receive a huge payout. And so when you think about this in terms of June 29, 2012, the time when the reserves were set aside, there's no evidence whatsoever of any intentional procurement of a breach. What there is is uniform evidence of the parties wanting this to succeed, of them wanting the plant to make a go of it. Does that go to economic justification less so than the contract itself? In other words, I think what you're arguing is that State Street was justified in asking for those reserves because otherwise the entire program would have ended up falling apart sooner than it did. You know, when I try to hang it on the infrastructure of an intentional interference claim, it gets a little odd because I'm not sure where it fits. But I would say there's no evidence of any intentional procurement of a breach. I mean, the evidence is State Street stood indifferent to how or when strategic energy got paid. I mean, it had no dog in that hunt. And certainly it was justified as an outside investor in saying, these reserves need to be set aside because if the plant fails, everybody loses. And the deal with State Street was that it was supposed to get these tax credits and then it was supposed to get a guaranteed 8 percent, a quote-unquote guaranteed, 8 percent rate of return on the cash flow. And so everybody wanted this project to succeed and make money. And the difficulty was it was just a total fiasco. It just failed. Of course, just to add on to that, opposing counsel talked about the tax credits being the unjust enrichment. And I just want to give you a chance to respond to that since you're unique on that particular point. Yes, thank you, Your Honor. Well, we received the benefits of an express written contract for which we paid $25 million. So there's nothing immoral, unlawful, or what's the other one, illegal about us receiving what we bargained for. And, in fact, there are a couple of decisions right out of this court that I think say we win. The big one on the unjust enrichment case is Ringgier, I don't know if I'm saying it right, America versus Land O'Lakes, that basically says, and this is my big takeaway, I think, for the court, is that this was a heavily negotiated contract. We spent six months negotiating this between January and June 2012, all sophisticated parties, all with counsel, including Strategic Energy. And this Court in the Land O'Lakes case said in that context, we're going to leave you folks to your bargain. And you say the same thing in Annexco, I forget the rest of the name of the case, but the Annexco case, which if you were to reach the disproportionate forfeiture argument that was never raised below, Annexco says we win that one, too. Thank you, Your Honor. All right. Well, that was very helpful. Thank you for your argument. Mr. Boylan, we'll hear rebuttal. Let me start with a couple of questions, actually, that came up. No argument regarding 43,000. You're right, Your Honor, it's right in our brief. Number two, subsequent payments, they're not in dispute. The counsel for Atoke argued, actually, they are. It's all over our brief. Whether or not those should have been paid by State Street and whether or not it was wrongful for them to first put in the $25 million and then restructure the, insist on a restructuring, where instead of State Street giving another $10 million, now the money came from Atoke. Just like insisting that the $1.9 million get set aside, they said, we insist, we're not going to put in another $10 million. You do it. Later, my client comes along and says, am I not entitled to payment? No, no, no. The next two installment payments were never made. Thus, condition never satisfied. What about the argument, though, that opposing, and this goes with the acronyms, the P entity, which is the plant, and the D versus development. He says the P entity wasn't part of it and it was earmarked for somebody who had no obligation to, you know, turn this over and it was just independent of the agreement. Yeah. Take a look at my reply brief, pages 12 to 14, where we deal with this. We describe the fact that here's the, and I won't parse it for you because I've only got two and a half minutes, but we deal with it right there in our brief at pages 12 to 14. The parties we're talking about, the only way they would have had proceeds available to them was through BVBP. There was nothing, no payments under these transaction documents were going to ATOCA or BVBD. So, read fairly, the only way proceeds ever would have been available, pursuant to that first paragraph we talked about in the MIPA, to ATOCA or BVBD would have been through BVBP. That's point number one. Point number two is the shell game of is it P or is it D, they chose at the last minute where this money went. Didn't you agree to that, though, when you agreed that availability would be based on what's in the transaction documents? Well, yes and no, Your Honor. We walked through the three iterations previously, and I agree with them that the instruction letter ultimately starts at 650 and the page, which is identical to the page I referred you to, is actually 773. It shows 1.9 million going to that operating account. I know that they say, look, we had all of these payables ballooned. We didn't know what we were going to do. But that doesn't change the plain fact of the matter, that if I get $1.9 million deposited in my account, those are proceeds available for whatever use I'd like to make of them. What do you mean, my account? Well, for them, it is BVBP. But they're not a party to this agreement. To the MIPA? Right. Yes, but, Your Honor, BV, and it's right on page 12 and 14 of our brief. I know I'm short on time. We walked through ATOCA and BVBD effectively owned and controlled BVBP. And so trying the shell game of we've moved the money into an account that is actually over here, which doesn't ever owe you money, well, BVBD and ATOCA were never going to be overall agreements. The money was always going to go into BVBP. So the last thing, Your Honor, that I want to make sure that I mention, and I know I'm out of time. Look, there's this argument that we were in economic stress and we insisted on these things and we were the white knights coming through here. The reality is that if they had not put in the $25 million at that moment, my client would have remained an owner of the plant, okay. They would have never had to put in any money. But my client agreeing to sell his interest in the plant enabled this transaction to happen. To do a tax equity transaction, you had to have control over the ownership. It's in our briefs. We enabled it. And through that, State Street ultimately did get $19 million of tax credits. But in the meantime, they redirected where the money should go, and they refused to put in the next two $5 million installments. They still got the benefit of the transaction, and my client was left out in the cold. This is tons of facts. All right. Your time has expired. Thank you very much for your argument. I appreciate it, Your Honor, and thank you for your patience.